Michael C. Geraghty, ABA#7811097
J. Craig Rusk, *Admitted Pro Hac Vice*
Email: geraghty@oles.com
        rusk@oles.com

*Attorneys for Defendant UNIT-ASRC Construction, LLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA for the use and benefit of PRECISION CRANES, INC., an Alaska corporation<br><br>    Plaintiff,<br><br>    v.<br><br>TESTER DRILLING SERVICES, INC., an Alaska corporation; TRAVELERS CASUALTY AND SURETY CO. OF AMERICA, a Connecticut corporation; and LIBERTY MUTUAL INSURANCE COMPANY, a Massachusetts corporation (Bond #106721293)<br><br>    Defendants. | Case No. 4:18-cv-00019-TMB |

**DEFENDANTS TRAVELERS CASUALTY AND SURETY CO. OF AMERICA'S AND LIBERTY MUTUAL INSURANCE COMPANY'S OPPOSITION TO PLAINTIFF'S RULE 56 MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants Travelers Casualty and Surety Co. of America and Liberty Mutual Insurance Company (collectively, "Defendant Sureties") hereby file this Memorandum in Opposition to Plaintiff Precision Cranes, Inc.'s ("Precision") Motion for Partial Summary Judgment (the "Motion").

**OLES MORRISON RINKER & BAKER LLP**
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

# INTRODUCTION

The United States Government, through the administration of the U.S. Army Corps of Engineers ("USACE"), contracted with UNIT-ASRC Construction, LLC ("UNIT-ASRC") for the construction of the Long Range Discrimination Radar Construction Package #1—Site Infrastructure, Mission Control Facility ("MCF"), and Substation at the Clear Air Force Station in Clear, Alaska (the "Project"). UNIT-ASRC furnished a payment bond, Defendant Sureties' Bond #106721293, in the amount of $112,949,720 (the "Bond"), as required by the Miller Act, 40 U.S.C. § 3131(b)(2). UNIT-ASRC, the general contractor, executed a subcontract with Tester Drilling Services, Inc. ("TDSI") for TDSI to provide eight cased wellbores on the Project. TDSI subcontracted with Precision to provide crane services and labor to TDSI in support of TDSI's work on the Project. TDSI failed to properly perform its work on the Project and was terminated for convenience.

Precision now moves for Partial Summary Judgment against the Defendant Sureties, asserting, pursuant to the Miller Act, it is entitled to $577,312.31 in unpaid rental and labor fees. Precision asserts it is entitled to the full amount of its unpaid invoices, despite its invoices claiming 3,000.5 man-hours worked (totaling $339,526 in claimed labor expenses owed by UNIT-ASRC), its own Certified Payroll claiming 2,939.5 man-hours worked (and a total of $200,227 paid to its employees for these hours), and TDSI's daily reports (the only contemporaneous record of hours worked on site) that were submitted during the Project show only 2,485 Precision man-hours

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 2 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB   Document 36   Filed 10/25/19   Page 2 of 30

**OLES MORRISON RINKER & BAKER** LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

worked. Precision's Motion ignores the fact that recovery under its subcontract with TDSI is not equal to amounts that may be recovered from UNIT-ASRC's Miller Act Bond. While the terms of Precision's subcontract may entitle it to a contract action against TDSI, Precision may only recover under the Miller Act for value added to the Project. Disputes of material fact exist, barring Precision from its requested relief on its Motion for Partial Summary Judgment. Alternatively, Precision has failed to show it is entitled to judgment as a matter of law against Defendants.

There are significant issues of fact as to whether Precision progressed the work on the Project and added any value. In fact, it will be shown that not only did Precision fail to progress the work, it contributed to delay and caused substantial re-work on the Project. Precision is seeking to be paid for work it did not properly perform, and for the cost of correcting deficiencies it, and TDSI, created. As such, Precision is not entitled to recovery of its invoiced amounts under the Miller Act.

Even if Precision did progress the work and add value, there are significant issues of fact with respect to Precision's damages calculation of $577,312.31. Precision's subcontract agreement with TDSI calls for payment on equipment rentals on a monthly basis, however, labor is to be paid hourly for services actually performed. Precision's claimed damages are based on unpaid invoices. As noted above, there are substantial discrepancies between the hours claimed in the invoices and what is shown on the actual Project records. UNIT-ASRC records do not show that TDSI provided daily-hours reports for August 8, 2017 and August 10, 2017, as the reports are not

**OLES MORRISON RINKER & BAKER** LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 3 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB   Document 36   Filed 10/25/19   Page 3 of 30

included in UNIT-ASRC's daily quality-control reports. Declaration of Michael Fall ("Fall Decl."), ¶ 23, n. 1. However, in discovery, TDSI's documents appear to include reports for these two days. *Id*. In any event, this only concerns 135 total hours between those two days. *Id*. Even if those hours were awarded to Precision, which UNIT-ASRC does not concede because UNIT-ASRC did not receive an accounting of these hours during the Project, Precision's certified payroll would still show 319.5 more hours than TDSI's daily reports. *Id*. Precision did not keep timecards or daily reports during the Project and has no records that show what work was performed, how many man-hours were actually spent on each day, or support for its splitting an individual's time between different categories of work and thus charging different rates for the same individual.

In addition to the above issue, a review of TDSI's daily reports shows that Precision invoiced for hours when it did not actually perform work, when there is no record of Precision being on site, and for phantom services where records show Precision left the site early. Also, a comparison of Precision's own payroll against the amount Precision claims is owed shows that Precision is claiming amounts it never paid its employees. Specifically, Precision's own certified payroll shows that it paid its employees a total of $200,227, while it invoiced TDSI, and thus UNIT-ASRC, $339,526 for the same employees. More than one third of this difference is made up by employee Scott Polecat, who Precision only paid $62,680.86 despite invoicing $108,186 for his work. Precision also fails to provide any evidence as to how and

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 4 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB   Document 36   Filed 10/25/19   Page 4 of 30

**OLES MORRISON RINKER & BAKER LLP**
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

when it billed its employees at different wage classifications. In addition, Precision has failed to provide any support for its claimed rental rates, or any justification as to why it is entitled to recover rental fees for delay caused by Precision. Precision has not shown the absence of any disputed material fact with respect to its claimed invoices.

Precision relies heavily on *United States ex rel. Thyssenkrupp Safway, Inc. v. Tessa Structures, LLC*, No. 1:10cv512 (E.D. Va. 2011) for the proposition that Precision is not precluded from recovering under the Miller Act due to TDSI's alleged breach of its subcontract with UNIT-ASRC. However, *Tessa Structures* did not concern a subcontractor where there were substantial questions about the accuracy of its invoices and that (1) billed for rental rates after delaying the Project, (2) billed for repairing mistakes it created itself, and (3) did not provide any backup documentation whatsoever in support of claimed amounts owed. Unlike *Tessa Structures*, where the supplier's performance was not the cause of its termination for default, Precision's deficient performance is directly at issue. The appropriate measure of recovery under the Miller Act is "the reasonable value of the labor and materials furnished which furthers the prosecution of the project work." *Rocky Mountain Tool & Mach. Co. v. Tecon Corp.*, 371 F.2d 589, 594 (10th Cir. 1966). Therefore, Precision is not entitled to recover under the Miller Act for unsupported and overbilled costs, and for costs it caused without progressing the underlying contract.

**OLES MORRISON RINKER & BAKER** LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106    Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 5 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB    Document 36    Filed 10/25/19    Page 5 of 30

# STATEMENT OF MATERIAL FACTS

## I.  Project Overview

UNIT-ASRC is a joint venture made up of UNIT COMPANY and ASRC SKW Eskimos, Inc.  UNIT-ASRC has successfully completed over $100 million in large-scale, multi-year construction projects for the USACE in Alaska.

UNIT-ASRC entered into a $112,949,720 firm fixed price contract with USACE to construct the Project.  Declaration of Michael Fall ("Fall Decl."), ¶ 2.  The facility provides operations/maintenance space, utilities for the radar system, and environmentally controlled equipment areas.  The fully designed facility includes a reinforced concrete foundation, structural steel frame with insulated metal skin, HEMP shielding and standing seam metal roof, ground water cooling wells, heat plant, power substation, fire suppression/detection, site improvements, utility and communications extensions, and all other necessary work to provide a complete and usable facility for the Long Range Discrimination Radar ("LRDR") program for the Missile Defense Agency.

On or about July 10, 2017, TDSI entered into a firm fixed price subcontract with UNIT-ASRC to perform work related to the water-supply well construction, development and pumping specifications and features of the work.  *See* Fall Decl., ¶ 3, Ex. 2.  TDSI's scope of work included drilling and installing 24-inch diameter by 300 foot deep stainless steel well casings in eight locations within the footprint of the

**OLES MORRISON RINKER & BAKER** LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 6 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

building.  *Id*.  Six of these wells provide the cooling water, and the remaining two provide the fire protection water, for the MCF.  *Id*.

The MCF serves as the operations center for the radar system and provides all utilities for the adjacent structures.  On-time completion of the MCF is essential to ensuring the radar system is fully operational by a Congressionally-mandated deadline. To that end, the Contract includes multiple schedule milestones that must be achieved. *Id*., ¶ 4.  TDSI's scope of work was on the critical path of the Project schedule and was located within the building's footprint, meaning successor contractors would have to wait for TDSI's scope to be completed or find a way to work around TDSI.  *Id*., ¶ 3, Ex. 3.  As such, TDSI's scope of work had a direct impact on UNIT-ASRC's ability to achieve timely milestone completions and final Project completion.  *Id*., ¶ 4.

## II.  TDSI's Performance of Its Work

While TDSI was contracted to provide eight wells on the Project, it only performed work on two of the eight wells.  Fall Decl., ¶ 6.  In addition, both of the wells TDSI did perform work on had significant problems and UNIT-ASRC was forced to fill in the shafts and its follow-on subcontractor re-drilled the wells.  *Id*.

Prior to submitting its initial bid, UNIT-ASRC and TDSI spent significant time planning and defining the drilling operation and TDSI's performance of the work in order to develop a detailed proposal schedule to be submitted with UNIT-ASRC's bid. *Id*. ¶ 5.  During that process, TDSI convinced UNIT-ASRC it had a thorough understanding of the work and complexities involved in the well operation and that it

**OLES MORRISON RINKER & BAKER** LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106    Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 7 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB   Document 36   Filed 10/25/19   Page 7 of 30

was capable of completing its scope of work.  *Id*.  On May 9, 2017, three days after receiving its Notice to Proceed from the Owner, UNIT-ASRC issued a Letter of Intent to award a contract for the well drilling and development scope of work to TDSI.  *Id*., ¶ 7, Ex. 4.

TDSI subcontracted with Precision to provide crane services to TDSI in connection with TDSI's scope of work.  *See* Memorandum in Support of Precision's Motion, Ex. 8, Precision's Subcontract.  Specifically, Precision "rented cranes to TDSI, [it] operated the cranes: i) to pick and move a variety of equipment (i.e. rotators, oscillators, etc); ii) to raise and lower and to operate the jaws of the Grab; iii) to pick, move, and set sections of temporary casing; iv) to perform miscellaneous lifts/moves for TDSI and other contractors on the Project; v) to lower a man-basket inside one well casing for casing repairs; and vi) ultimately to extract casing from some of the wellbores.  *Id*., Ex. 4, ¶ 20.  Prior to executing the subcontract, Precision provided quotes for crane rentals using a monthly rate, and labor man-hours using hourly rates.  *Id*., Exs. 3-5.  In addition, Precision requested and TDSI confirmed "2 operators and one rigger per shift."  *Id*., Ex. 6.

Once TDSI/Precision began performing, problems quickly arose.  For example, while drilling its first well, Fire Protection Well #1 ("FP-1"), TDSI, per its planned drilling procedure, had to advance temporary casing to allow it to excavate the soil inside the temporary casing.  Fall Decl., ¶ 10.  TDSI, through its subcontractor Precision, then was to insert permanent 24" SST casing into the shaft with the well

**OLES MORRISON RINKER & BAKER** LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 8 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

screen attached to the bottom of the casing. *Id*. TDSI's initial selection of a "Grab Tool" to excavate the inside of the shaft was undersized, requiring a replacement Grab Tool to be air-freighted to the Project, and/or Precision's operators were unreasonably slow in operating the Grab Tool, adding cost and time. *Id*. TDSI's Grab Tool sales representative, Champion Equipment, anticipated grab tool cycles of four to five minutes per bucket load. Memorandum in Support of Precision's Motion, Ex. 5. At a rate of five minutes per cycle, with an anticipated required 300 cycles per shaft, that would require 24 hours per drilling shaft. *Id*. However, when factoring in the time to add a casing segment every 20 feet, Champion Equipment estimated each shaft would take three to four shifts to complete. *Id*. TDSI itself estimated each shaft would take approximately 10 shifts. *Id*., Ex. 6. TDSI estimated it would complete all eight wells in approximately 80 shifts, or 40 to 45 days. *Id*. In actuality, TDSI did not complete a single well, and only performed work on two wells, despite being on site from July 31, 2017 to October 17, 2017, totaling 78 days. Fall Decl., ¶ 11. In addition, Precision did not furnish a crane that was compatible with anchoring the rotator to be used in advancing the temporary casing. *Id*., ¶ 9.

Precision failed to provide sufficiently-skilled crane operators to operate the Grab Tool with sufficient speed to meet the needed production rates. In addition, on at least three separate instances, operator error brought the work to a halt and time was spent correcting the errors. Two instances were a result of fouling the crane's main cable lines which required the cable to be completely replaced twice. *Id*. ¶12.

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 9 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB    Document 36    Filed 10/25/19    Page 9 of 30

OLES MORRISON RINKER & BAKER LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

Additionally, a Precision operator's lack of skill in operating the equipment resulted in the Grab Tool being stuck in the casing. *Id.* ¶ 13. Specifically, TDSI and Precision agreed prior to the Project that Larry Clark would work with Scott Polecat on day shift, as Mr. Clark was relatively inexperienced and Mr. Polecat would be able to mentor him. *Id.*, Ex. 6. Precision, without TDSI's input or knowledge, changed this scheduling, instead having Larry Clark serving as night shift operator, while Scott Polecat worked during the day. *Id.* On August 17, 2017, during the night shift of the same day TDSI raised concern about the scheduling change to Precision, Mr. Clark stuck the Grab Tool in the well casing. *Id.* This resulted in significant effort to unstick the Grab Tool and repair the tool and main crane cable, causing additional delay and disruption to the work. *Id.*, ¶¶ 13-14, Ex. 7. The procedure to unstick the Grab Tool ultimately caused the casing to slip, resulting in additional delays and disruption to the work and Precision spending time and effort to address these problems. *Id.*, ¶ 13 Ex. 5. In total, these related issues caused delays through August 22, 2017. *Id.* Despite being responsible for the delays and the need to spend man-hours freeing the Grab Tool, Precision includes these man-hours in its claim. Precision is also trying to bill for time spent when no work was ongoing.

In addition, on August 28, 2017, the FP-1 well 36" temporary casing separated at an approximate depth of 66 feet below grade. *Id.*, ¶ 15; Opposition to the Motion, Ex. 2, August 28, 2017. This brought all drilling on the shaft to a halt. Repairing the separated casing required the development of a comprehensive repair/extraction plan,

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 10 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB   Document 36   Filed 10/25/19   Page 10 of 30

OLES MORRISON RINKER & BAKER LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

which included Precision hoisting a welder in a basket down into the temporary 36"-wide shaft to weld the casing together. *Id.* UNIT-ASRC dedicated hundreds of man-hours to assist TDSI with the preparation of this plan in an effort to mitigate delays. *Id.* While this plan was being developed, all drilling work stopped on this shaft. Before the recovery plan could be implemented, due to significant safety concerns, the USACE had to review and approve the plan and the basket to hoist the welder had to be custom made. *Id.* From the date the casing separated, it took TDSI 40 calendar days to extract the casing and make the shaft ready for work to proceed. *Id.* Progress of TDSI's work completely stopped on the impacted shaft during these 40 calendar days. *Id.* While Precision provided labor and equipment to perform tasks related to resolving these problems, it included such costs in its claim. Precision continued to bill as if it were progressing its drilling throughout this time. *Id.*; Ex. 11. Also, while there was some work being performed on the second shaft, Precision billed for more than the agreed upon two operators and one support person.

TDSI attempted to procure additional casing to supplement casing that had failed on FP-1. The new casing that arrived on site did not adequately align with the existing casing. *Id.* ¶ 16. Due to the previous experience of the separated casing causing significant delays, it was determined that utilizing the new casing was an unacceptable risk to the Project. *Id.* As a result, drilling stopped for 37 days. *Id.*; Opposition to the Motion, Ex. 2, 9/7/17 through 10/13/17. Precision continued billing during this time, even though it was not performing work. *Id.*

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 11 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

**OLES MORRISON RINKER & BAKER LLP**
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106 Fax: (907) 258-5519

### III. UNIT-ASRC Terminated TDSI for Convenience, and Retained a Replacement Contractor

UNIT-ASRC made repeated attempts to contact Peter Tester of TDSI throughout September 2017 without receiving any response. Fall Decl., ¶ 17. In addition, UNIT-ASRC offered and applied substantial resources to locate and expedite sources and types of equipment to perform work to assist TDSI, again not receiving a response. *Id*. On September 6, 2017, the USACE wrote to UNIT-ASRC demanding a recovery plan to mitigate schedule impacts. TDSI did not assist UNIT-ASRC in developing such a plan. *Id*., ¶ 18, Ex. 8. On September 15, 2017, UNIT-ASRC wrote to TDSI demanding that TDSI cure its deficiencies and provide a clear path forward to prompt completion. *Id*., ¶ 19, Ex. 9. TDSI failed to provide an adequate response. *Id*. On October 16, 2017, UNIT-ASRC terminated TDSI's contract for convenience. *Id*., ¶ 20, Ex. 10.

In total, TDSI's failure caused a 73-day delay to the Project. *Id*., ¶ 22. UNIT-ASRC was required to secure a replacement drilling contractor and mobilize all equipment from California, at significant and unplanned cost. *Id*., ¶ 21. UNIT-ASRC's replacement contractor was required to fill in and re-drill the two wells TDSI began work on, but was ultimately able to complete the work, despite the work being performed during the cold winter months, rather than the summer and fall as planned. *Id*. As a result of TDSI's and Precision's failure to properly perform, the schedule slipped 73 days, adding significant costs after UNIT-ASRC was forced to re-sequence

**OLES MORRISON RINKER & BAKER LLP**
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106    Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 12 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB    Document 36    Filed 10/25/19    Page 12 of 30

successor work, and potentially subjecting UNIT-ASRC to substantial claims from its other subcontractors. *Id.*, ¶ 22.

## IV.    Precision's Claims and Supporting Invoices

Precision moved for Partial Summary Judgment on its Miller Act claim for unpaid amounts due on its subcontract with TDSI. *See* Precision's Motion. Precision asserts that TDSI failed to pay rental and labor fees totaling $577,312.31 for equipment Precision supplied and operated for use on the Project. *See* Memorandum in Support of Precision's Motion, p. 2. Precision's invoices consist of two parts: equipment rentals and labor rates. There are significant issues of fact regarding the claimed amounts for each of these two parts. In addition, Precision has not produced timecards relating to these invoices and has confirmed that it did not keep timecards or any other daily record of the work being performed, or the actual man-hours being incurred. *See* Opposition to the Motion, Ex. 1, Precision's Responses to UNIT-ASRC's Request for Production #3 ("Precision does not have daily reports, memos or other documents to track the work except certified payrolls."). As a result, there are no contemporaneous records produced by Precision that substantiate its claimed man-hours.

Precision seeks payment of four unpaid invoices; Invoices Nos. 3343, 3349, 3361, and 3366. Memorandum in Support of Precision's Motion, p. 7. Precision's Motion does not detail how each invoice was compiled or how the man-hours per invoice were determined.

**OLES MORRISON RINKER & BAKER** LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106    Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 13 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB    Document 36    Filed 10/25/19    Page 13 of 30

The only documents produced by Precision supporting Precision's claimed man-hours are its Certified Payrolls. Certified Payrolls are federally mandated documents detailing wages paid to employees on federally-funded projects. Fall Decl., ¶ 23. On the other hand, TDSI prepared contemporaneous daily reports, which track work performed, labor hours by individual, and equipment usage on a daily basis. Daily reports are required by federal cost accounting standards. *Id*. The man-hours sought in Precision's invoices exceed the man-hours identified in Precision's own Certified Payrolls and those shown in TDSI's daily reports. Declaration of Fred Strand ("Strand Decl."), ¶ 15. A review of Precision's invoices show Precision invoiced 3,000.5 total man-hours, exceeding the 2,939.5 man-hours shown on Precision's Certified Payroll. *Id*. In addition, a comparison of the man-hours in Precision's Certified Payrolls against the man-hours in Tester's daily reports shows significant discrepancies. *See* Fall Decl., Ex. 11; Strand Decl., ¶ 15. In total, the Certified Payroll shows 2,939.5 man-hours, while the daily reports only show 2,485 man-hours, representing a difference of 454.5 man-hours. *Id*. While the daily reports were created by TDSI, not Precision, the TDSI daily reports are the only contemporaneous record accounting for Precision's man-hours because Precision failed to produce its timecards. The difference of 454.5 man-hours is not a reasonable difference or within any accepted margin of error. Strand Decl., ¶ 18. Not only is the difference in man-hours unreasonable, but Precision's own certified payroll shows that it paid its employees a total of $200,227, while it invoiced TDSI, and thus UNIT-ASRC,

OLES MORRISON RINKER & BAKER LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106  Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 14 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

$339,526 for those employees. *Id.*, ¶ 20. In addition, Precision paid Scott Polecat $62,680.86, despite invoicing $108,186 for his work. Mr. Polecat was requested as a crane operator by TDSI, and was put on the Precision payroll for insurance purposes because he would be operating Precision cranes. Kuykendall Decl., ¶ 18. Precision has not provided any explanation as to why an employee on its payroll simply for tax purposes has such a large markup on labor hours. Also, Precision billed for different billing categories for its workers—meaning at times it paid its employees as crane operators, while at other it paid them, at a different rate, as engineers—without providing support or backup documentation. Strand Decl., ¶ 19.

Based on a review of daily reports, the following is a representative example of some, but not all, of the differences between Precisions Certified Payroll and Tester's daily reports: Precision (1) billed for complete days when its crews arrived, even if no work was performed or the crews were unable to access the worksite, (2) billed for complete days when its crews did not perform complete days, (3) billed for complete days during a mandatory shutdown, and (4) billed for complete days while waiting for recovery plans to be approved. *See, e.g.*, Fall Decl., ¶ 24 (including table providing all relevant dates for each of the aforementioned categories); Ex. 11; see also Ex. 12 (showing 0 hours worked on TDSI's daily report, despite the Certified Payroll claiming 15.5 hours for Scott Polecat), Ex. 13 (showing 10.5 hours worked for each employee on TDSI's daily report, when the Certified Payroll claims 12-15.5 hours for each employee), Ex. 14 (showing 0 hours worked during mandatory shutdown on TDSI's

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 15 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB   Document 36   Filed 10/25/19   Page 15 of 30

OLES MORRISON RINKER & BAKER LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

daily report, despite the Certified Payroll claiming 12.5 hours for Scott Polecat), and Ex.15 (showing 0 hours worked while waiting for approval to proceed with repairs on TDSI's daily report, despite the Certified Payroll claiming 12.5 hours for Scott Polecat). An analysis of Precision's certified payroll compared against TDSI's daily reports, the only contemporaneous record of work performed by Precision, shows that Precision frequently overbilled. Precision's certified payroll shows that it often paid employees, and Scott Polecat in particular, 12-15 hours per day, even when its employees did not work that many hours. *Id.* In addition, Project shifts were typically 12 hours, and the TDSI daily reports indicate as much, but Scott Polecat was, at times, paid for 15 hours at a time. *Id.* Precision has not provided any explanation as to why it billed in the way it did, or what hours make up those man-hours claimed in its invoices. Precision's certified payroll frequently is overbilled when compared against TDSI's daily reports. Precision also has not provided, and apparently cannot provide, timecards to substantiate its invoiced man-hours. Precision may argue that it had an agreement with its employees to pay them on a daily basis, or some minimum number of hours per day. However, Precision's subcontract calls for labor hours to be paid by the man-hour, as opposed to a daily rate. Precision could have, but did not, set up a different measurement of payment in its Subcontract. Nevertheless, it appears Precision charged a daily rate for some of its employees, particularly Scott Polecat. *Id.*, Exs. 11-15.

**OLES MORRISON RINKER & BAKER** LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106    Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 16 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB    Document 36    Filed 10/25/19    Page 16 of 30

In addition, the rental rates charged by Precision exceed those specified by federal cost accounting standards. Precision owns the equipment at issue, and Federal Acquisition Regulation ("FAR") 31.105 requires "actual cost data" be used for rental rates of owned equipment. Strand Decl., ¶ 6. TDSI's Subcontract, incorporated by reference into the Precision Subcontract, requires that proposed overhead and markup rates be in accordance with the FAR. Fall Decl., Ex. 4. A contractor is to consider the following factors in determining equipment cost: (a) cost of equipment less estimates of its salvage value, (b) the probable life of the equipment, (c) the average idle time during the life or period of hire of the equipment, and (d) the cost of operating the equipment. Strand Decl., ¶ 6. Precision's Motion fails to provide an explanation of its rental rates for its specific equipment and Precision has refused to give any information in its Motion, or throughout discovery, as to how its rental rates were calculated. Based on an analysis of Precision's quoted monthly rental rates compared against USACE rental rates for similar equipment and general industry standards regarding monthly equipment rentals, the expected monthly rental rate for the Link Belt RTG-80100 is $9,000 to $22,500, and the expected monthly rate for the P + H 5100 is $5,200 to $13,000. *Id.*, ¶¶ 7-9. These rates are significantly less than Precision's quoted rates of $37,500 and $25,500 for the Link Belt RTG-80100 and P + H 5100 respectively. *Id.* Based on an analysis of Precision's rental rates, it appears that Precision's rates are unreasonable and not supported industry standards, as the Link Belt crane exceeds expected rates for comparable equipment by $28,500 when using the lowest expected

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 17 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB   Document 36   Filed 10/25/19   Page 17 of 30

OLES MORRISON RINKER & BAKER LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

rate, and $15,000 when using the most conservative estimate, and the P + H 5100 exceeds the expected rate for comparable equipment by $20,300 when using the lowest expected rate, and $12,500 when using the most conservative estimate. *Id.*, Ex. 2. Because a Miller Act claimant may only recover the reasonable value of its labor and materials provided in prosecution of the prime contract work, Precision cannot recover for its equipment rentals to the extent its rates are unreasonable.

Precision's invoices list costs for mobilization and demobilization of equipment. Strand Decl., ¶ 12. Specifically, Precision invoiced $1,200 for mobilization and $1,200 for demobilization of the Link Belt crane. *Id.* It invoiced $13,600 for mobilization and $13,600 for demobilization of the P + H 5100. *Id.* It did not provide any explanation as to why mobilization and demobilization of the P + H 5100 is more than ten times greater than that of the Link Belt crane. If a portion of mobilization or demobilization is labor, it should not be duplicated as separately stated labor costs. *Id.*

Precision's claimed invoices are not consistent with Project documentation or acceptable accounting practices.

## ARGUMENT

### I.      Standard for Summary Judgment

The party moving for summary judgment has "the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes*

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 18 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

**OLES MORRISON RINKER & BAKER** LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

*v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (footnote omitted).

> "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted). "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotations omitted). "[T]he moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Id*. (citations omitted). If the moving party is able to meet this burden, the burden shifts to the opposing party to present significant probative evidence tending to support its defense. *Id*.

Here, Precision failed to meet its initial burden of establishing the absence of a genuine issue of fact on each issue material to its case. However, even if Precision did meet this burden, UNIT-ASRC can present significant probative evidence tending to support its defense. As such, summary judgment is improper.

OLES MORRISON RINKER & BAKER LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 19 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB   Document 36   Filed 10/25/19   Page 19 of 30

## II. Precision Has Not Met Its Initial Burden

As a preliminary matter, Precision's Motion does not perform any analysis showing a lack of disputed material fact with respect to amounts it claims it is owed. Precision's Motion seeks $577,312.31 in unpaid invoices under the Miller Act. However, Precision does not provide any analysis whatsoever substantiating the amounts claimed in these invoices. Precision's Motion simply lists the invoices by number and amount owed. A party seeking summary judgment must go beyond stating bare assertions, the movant "has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). There is no dispute that the valuation of Precision's claim is material to its case. As such, before the burden is shifted to Defendants to identify any dispute of material fact, Precision bears the burden of showing that its valuations are undisputed. Precision cannot meet that burden.

Precision's Motion does not perform any analysis identifying contemporaneous records showing its hours invoiced are reasonable, that its invoiced rates are reasonable, or that there is no dispute as to the amounts in any of those invoices. Precision's Motion must show two things to be granted: (1) that Precision is entitled to unpaid invoices under the Miller Act, and (2) that the unpaid invoices accurately reflect the value of work performed by Precision. Precision wholly disregards the

**OLES MORRISON RINKER & BAKER LLP**
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106    Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 20 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB    Document 36    Filed 10/25/19    Page 20 of 30

second of these two requirements. Under the FAR, a contractor is responsible for properly supporting its invoices. Strand Decl., ¶ 16. Some form of contemporaneous documentation, such as timecards, is typically necessary when invoicing specific man-hours. *Id.* Precision did not keep timecards or any form of contemporaneous record. *Id.* In addition, and contrary to both the FAR and Precision's Subcontract, Precision did not provide any basis for assigning hours to specific labor categories for its employees performing work under multiple categories. *Id.*, ¶ 19. Precision's Motion simply presents a conclusory amount it claims to be owed without any analysis or backup to support that valuation. Because Precision's Motion ignores an essential element of its claim, the valuation of its claim, Precision has not met its initial burden and its Motion should be denied on that basis alone.

### III. Even if Precision Met Its Initial Burden, Precision Is Not Entitled to Recovery Under the Miller Act

The Miller Act, 40 U.S.C. § 3131, requires contractors on any federal government contract exceeding $100,000 for the construction, alteration, or repair of any public building or public work to furnish performance and payment bonds to the Government. At issue in this case is UNIT-ASRC's Miller Act payment bond, which is a bond equal to the payable amount according to the terms of the government contract for the protection of all person supplying labor and material in carrying out the work provided for in the contract. 40 U.S.C. § 3133(b)(2).

The Act expressly limits Miller Act claims to claims for "labor or material [furnished] in carrying out work **provided for in a contract for which a payment**

Opposition to Plaintiff's Motion for Partial Summary Judgment - Page 21 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB   Document 36   Filed 10/25/19   Page 21 of 30

OLES MORRISON RINKER & BAKER LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106    Fax: (907) 258-5519

**bond is furnished**" under the Act. 40 U.S.C. § 3133(b)(1) (emphasis added). While it is true that the Miller Act is highly remedial and entitled to a liberal construction, it is only intended "to protect those whose labor and materials **go into public projects**." *U.S. for Benefit and on Behalf of Sherman v. Carter*, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776 (1957) (citations omitted). It is undisputed that a Miller Act claimant must show that "the labor or material was furnished **in the prosecution of the work provided for in the prime contract**." Memorandum in Support of Precision's Motion, p. 11 (citing *United States ex rel. Warren Painting Co. v. J.C. Boesplug Construction Co.*, 325 F.2d 54, 62 (9th Cir. 1963)) (emphasis added). Precision invoiced for unsupported amounts for work that was not furnished in the prosecution of the prime contract. Precision's unsupported invoices include time periods where the Project was delayed as a result of Precision's own actions, Precision's employees were not performing actual work, and/or Precision's employees were performing repair work for deficiencies Precision contributed to. In addition, significant questions of fact remain as to the labor and rental rates invoiced by Precision.

### A. Precision Did Not Provide Sufficient Value to Be Entitled to Compensation It Seeks Under the Bond

"The measure of recovery by a sub-contractor against a prime contractor with whom no direct contractual relationship has existed is limited under the Miller Act to the reasonable value of the labor and materials furnished which furthers the prosecution of the project work." *Rocky Mountain Tool & Mach. Co. v. Tecon Corp.*, 371 F.2d 589, 594 (10th Cir. 1966). If a Miller Act defendant can show "that the costs

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 22 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB    Document 36    Filed 10/25/19    Page 22 of 30

OLES MORRISON RINKER & BAKER LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

incurred by the contractor were excessive (as a result, for example, of inefficiency or extravagance), the amount of recovery is commensurately reduced." *Acme Process Equip. Co. v. United States*, 347 F.2d 509, 530 (Ct. Cl. 1965), *rev'd on other grounds*, 385 U.S. 138, 87 S. Ct. 350, 17 L. Ed. 2d 249 (1966) (citations omitted). "[T]he relation of cost to value [can be] negative by evidence of the sub-contractor's failure to meet progress and quality requirements and by evidence showing the necessity and cost of ultimate take-over in comparison with [the claimant's] contract prices." *Rocky Mountain Tool & Mach. Co. v. Tecon Corp.*, 371 F.2d 589, 594 (10th Cir. 1966); see also *Window Specialists, Inc. v. Forney Enterprises, Inc.*, 106 F. Supp. 3d 64, 94 (D.D.C. 2015); *United Structures of Am., Inc. v. G.R.G. Eng'g, S.E.*, 9 F.3d 996, 999 (1st Cir. 1993).

Here, Precision did not provide sufficient value to be able to recover and, in fact, Precision's inefficiency ended up costing UNIT-ASRC significant money and time. Precision caused multiple delays to the Project, ultimately being on site for 78 days without a single well being finished, despite planning to complete all eight wells in 40-45 days. Memorandum in Support of Plaintiff's Motion, Ex. 6; Fall Decl., ¶ 11. Precision's failure to provide sufficiently-skilled crane operators slowed the Project on at least three occasions—twice by fouling the crane's main cable line, and once by inadvertently sticking the Grab Tool into the well casing. Fall Decl., ¶¶ 12-13. The Grab Tool issue ultimately caused the casing to slip, resulting in additional delays. *Id.*, Ex. 5. These delays delayed the Project four full days. *Id.* In addition, TDSI and

OLES MORRISON RINKER & BAKER LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 23 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB   Document 36   Filed 10/25/19   Page 23 of 30

Precision spent 40 days attempting to resolve an issue with separated well casing at FP-1. *Id.*, ¶ 15. Questions of fact remain as to how exactly this happened, but Precision was responsible for handling and installing the casing.

Ultimately, UNIT-ASRC terminated TDSI for convenience. *Id.*, ¶ 20. UNIT-ASRC was forced to fill in the shafts partially completed by TDSI and Precision and its follow-on contractor was forced to restart the work. As a result, not only did TDSI and Precision fail to add any value whatsoever to the Project, they ultimately added negative value, as their poor work resulted in significant delays and rework. None of the costs incurred by Precision added value to the Project. Precision is not entitled to recover under the Miller Act.

### B. Precision Seeks to Recover for Costs Not Allowed by Its Subcontract

When a party brings a claim under the Miller Act, its recovery is limited to amounts due under its subcontract. Here, TDSI's subcontract with UNIT-ASRC was incorporated by reference into Precision's subcontract with TDSI. *See* Memorandum in Support of Precision's Motion, Ex. 8, § 1. TDSI's subcontract with UNIT-ASRC states that in the event the TDSI-UNIT-ASRC Subcontract is terminated for UNIT-ASRC's convenience, UNIT-ASRC shall only be liable to TDSI for the reasonable value of TDSI's work. Fall Decl., Ex. 2, ¶ 20. UNIT-ASRC terminated TDSI for convenience on October 16, 2017. *Id.*, Ex. 10. Precision claims it was terminated by TDSI via email on October 12, 2017. Kuykendall Decl., ¶ 21.

**OLES MORRISON RINKER & BAKER LLP**
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106    Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 24 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB    Document 36    Filed 10/25/19    Page 24 of 30

Because TDSI and Precision were both terminated for convenience, and because the TDSI-UNIT-ASRC Subcontract is incorporated into the Precision-TDSI Subcontract, Precision's possible recovery is limited to that outlined by the TDSI-UNIT-ASRC Subcontract—the reasonable value of the work provided at the time of termination. It is debatable whether Precision provided any value at the time of termination, as neither of the two well casings it began were completed, both had to be filled in by UNIT-ASRC, and the follow-on subcontractor was forced to completely start over. Fall Decl., ¶ 6. Even if recovery under the Miller Act is possible, Precision's potential recovery is limited to that outlined in its Subcontract—the reasonable value of work performed by Precision. Precision has not provided any evidence showing that its labor and rental rates claimed are reasonable or in accordance with the FAR, as is required by its Subcontract. Fall Decl., Ex. 4. In fact, it has been shown that Precision's rental rates are unreasonable pursuant to federal cost accounting standards. *See* Strand Decl., ¶¶ 7-11 (finding reasonable rental rates to be $9,000-$22,500 and $5,200-$13,000 for the Link Belt and P + H 5100 respectively, while Precision charged $37,500 and $25,500). In addition, Precision has not adequately supported its man-hours and charged labor rates. *See*, *infra* § III(C).

In addition, it appears the Precision charged a daily rate or some minimum number of hours for some of its employees. Regardless of whether Precision had such an agreement with its employees, its Subcontract with TDSI dictates that labor will be paid on an hourly basis. Memorandum in Support of Precision's Motion, Ex. 8.

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 25 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB   Document 36   Filed 10/25/19   Page 25 of 30

OLES MORRISON RINKER & BAKER LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

Recovery under the Miller Act is limited to "the labor or material was furnished in the prosecution of the work provided for in the prime contract." Memorandum in Support of Precision's Motion, p. 11 (citing *United States ex rel. Warren Painting Co. v. J.C. Boesplug Construction Co.*, 325 F.2d 54, 62 (9th Cir. 1963)). As such, Precision has no right to recover for time spent not performing work, or to be paid for a full day when one only works a partial day, regardless of any agreement it may have with its employees.

### C. Even if Precision Did Provide Sufficient Value to Be Entitled to Compensation Under the Bond, It Has Not Proven its Damages to the Requisite Degree of Reasonable Certainty

Miller Act claimants have the burden of proving damages to the requisite degree of reasonable certainty. *See, e.g.*, *United States v. Hartford Accident & Indemnity Co.*, 168 F. Supp. 3d 824 (D. Md. 2016). In the context of the Miller Act, "reasonable certainty" means "a rough calculation that is not too speculative, vague or contingent upon some unknown factor." *USA Mach. Corp. v. CSC Ltd.*, 184 F.3d 257, 265 (3d Cir. 1999) (internal quotations omitted). While Miller Act claimants often offer invoices as evidence of amounts owed, such documentation in and of itself does not guarantee automatic recovery of invoiced amounts. *Rocky Mountain Tool & Mach. Co. v. Tecon Corp.*, 371 F.2d 589, 594 (10th Cir. 1966) ("Proof of cost is properly admitted in most instances to probe the reasonableness of value furnished or performed but is not beyond the realm of dispute.").

OLES MORRISON RINKER & BAKER LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106    Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 26 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB    Document 36    Filed 10/25/19    Page 26 of 30

Here, Precision has not proven its damages to the requisite degree of reasonable certainty. The only support Precision offers for its damages is its unpaid invoices. However, none of these invoices include backup data or contemporaneous documentation verifying the accuracy of the hours claimed. A contractor is responsible for maintaining supporting documentation to adequately demonstrate claimed costs have been incurred. FAR 31.201-2(d). Typically, contemporaneous documentation in some form is necessary to prove labor hours. Strand Decl., ¶ 16. TDSI maintained the only contemporaneous record of Precision's labor hours, and TDSI's records of those hours show 515.5 man-hours less than the hours claimed on Precision's invoices. *Id.*, ¶¶ 17-18. The difference in labor hours between TDSI's daily reports and Precision's invoices is not reasonable or within an acceptable margin of error. *Id.* However, without backup documentation, it is impossible to determine the cause of this difference. Precision also has not provided support showing that its claimed rental rates are a proper measure of damages. Precision's rental rates are unreasonable when compared with comparable equipment. Strand Decl., ¶¶ 10-11. Precision has not provided any explanation as to how its rental rates were calculated in discovery or in its Motion. As such, Precision has not proven its rental rates are an appropriate measure of damages with any reasonable certainty.

In addition, Precision's certified payroll shows that its employees were paid both as ENGI302-002 and crane operators, and paid significantly different rates based on which role they were operating in. *Id.*, ¶ 19. However, Precision has not produced

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 27 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

**OLES MORRISON RINKER & BAKER LLP**
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

any records showing when each employee worked in each role. *Id.*; Memorandum in Support of Precision's Motion, Ex. 8, Precision's Subcontract, p. 9. TDSI's daily reports also do not delineate between Precision's employees' separate roles on the Project. Strand Decl., ¶ 19. As such, there is no record whatsoever, apart from Precision's invoices that do not contain backup documentation, showing hours worked in respective roles by Precision's employees. *Id.* In addition, when an employer on a federal project pays employees in multiple classifications, federal law, and Precision's contract, requires "the employer's payroll records accurately set forth the time spent in each classification in which work is performed." *Id.*; see also FAR 52.222-6(b)(3); Memorandum in Support of Precision's Motion, Ex. 8, Precision's Subcontract, p. 9. Precision has not proven within a reasonable degree of certainty when its employees worked as ENGI302-002 and when its employees worked as crane operators.

Precision's invoices list mobilization and demobilization costs, without providing backup documentation detailing what makes up those costs. In addition, TDSI's daily reports identify Precision man-hours for mobilization and demobilization, and Precision's certified payroll lists man-hours on corresponding days. If a portion of mobilization or demobilization is labor, it should not be duplicated as separately stated labor costs. Strand Decl., ¶ 12. Because Precision failed to support its invoices, it is impossible to tell whether it duplicated labor costs in mobilization and demobilization. As such, there is an issue of fact as to the proper amount owed to Precision and summary judgment should be denied.

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 28 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB   Document 36   Filed 10/25/19   Page 28 of 30

OLES MORRISON RINKER & BAKER LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

## IV.     Precision Is Not Entitled to Attorney Fees

Precision seeks attorney fees on the basis that it is the prevailing party in this lawsuit.  Typically, a prevailing party is one in whose favor a judgment is rendered. *See, e.g.¸ Klamath Siskiyou Wildlands Center v. U.S. Bureau of Land Management*, 589 F.3d 1027, 1030 (9th Cir. 2009).  Because questions of material fact remain and summary judgment is not proper, not judgment should be rendered in favor of Precision and an award of attorney fees would be improper at this time.

## CONCLUSION

Precision has not shown that it is entitled to recovery under the Miller Act in any amount.  However, even if Precision is entitled to recover under the Miller Act, it has failed to prove its invoiced amounts are reasonable and supported.  Significant issues of material fact exist as to whether Precision is entitled to its invoiced amounts and Precision's Motion for Summary Judgment and attorney fees should be denied.

OLES MORRISON RINKER & BAKER LLP

Dated:  October 25, 2019     By:     s/J. Craig Rusk_____
                                                     Michael C. Geraghty, ABA#7811097
                                                     J. Craig Rusk, *Pro Hac Vice*

                                                     *Attorneys for Defendants Travelers Casualty*
                                                     *and Liberty Mutual Ins Co.*

OLES MORRISON RINKER & BAKER LLP
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 29 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB

Case 4:18-cv-00019-TMB    Document 36    Filed 10/25/19    Page 29 of 30

CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2019, a copy of the foregoing document was served electronically on the following parties:

Brent R. Cole
WOELBER & COLE, LLC
*Attorneys for Precision Cranes, Inc.*

David M. Freeman
HOLMES WEDDLE & BARCOTT, PC
John S. Riper, *pro hac vice*
ASHBAUGH BEAL, LLP
*Attorneys for Tester Drilling Services, Inc.*

Meredith E. Dishaw, *pro hac vice*
WILLIAMS KASTNER & GIBBS PLLC
*Attorneys for Travelers, Surety, Liberty Mutual*

OLES MORRISON RINKER & BAKER LLP

s/J. Craig Rusk

**OLES MORRISON RINKER & BAKER LLP**
188 W. Northern Lights Blvd., Suite 1020
Anchorage, Alaska 99503-3985
Tel: (907) 258-0106   Fax: (907) 258-5519

**Opposition to Plaintiff's Motion for Partial Summary Judgment** - Page 30 of 30
*Precision Cranes Inc. v. Tester, Travelers Cas. and Surety Co. of Am., et al.*, Case No. 4:18-cv-00019-TMB